IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Sharon R. Cousar, | ) | Civil Action No. 3:08-392-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | **OPINION and ORDER** |
| v. | ) | |
| | ) | |
| Richland County Sheriff's Department, | ) | |
| B. Fields, individually and in his official | ) | |
| capacity as a Richland County Sheriff's | ) | |
| Department officer, and J.A. Clarke, | ) | |
| individually and in his official capacity | ) | |
| as a Richland County Sheriff's | ) | |
| Department officer, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on Defendants' Motion for Summary Judgment. Plaintiff has responded in opposition to the motion, and Defendants have replied to Plaintiff's response. For the reasons stated below, the court **grants** Defendants' motion for summary judgment as to Plaintiff's federal causes of action. The court declines to exercise supplemental jurisdiction over Plaintiff's state law causes of action and they are **dismissed without prejudice**.

STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from

1

those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987).

 The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the defendant is the moving party and the plaintiff has the ultimate burden of proof on an issue, the defendant must identify the parts of the record that demonstrate the plaintiff lacks sufficient evidence. The nonmoving party, here the plaintiff, must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also generally Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

 A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir. 1995).

 In deciding a summary judgment motion, the court must look beyond the pleadings and determine whether there is a genuine need for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-53 (1986). If the defendant carries its burden of showing there is an absence of evidence to support a claim, then the plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). An issue of fact is "genuine" if the evidence is such that a reasonable jury could

return a verdict for the plaintiff. *Anderson*, 477 U.S. at 248. An issue of fact concerns "material" facts only if establishment of the fact might affect the outcome of the lawsuit under governing substantive law. *Id.* A complete failure of proof concerning an essential element of the plaintiff's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322-23. Moreover, a "mere scintilla of evidence" in support of an essential element will not forestall summary judgment. *Anderson*, 477 U.S. at 251.

The court must determine whether, taken in the light most favorable to Plaintiff, there are disputed issues of material fact as to whether Defendants' conduct violated Plaintiff's constitutional rights. *Parrish v. Cleveland*, 372 F.3d 294, 301-02 (4th Cir. 2004). If the undisputed facts, so viewed, do not establish a violation of a constitutional right, the inquiry ends, and Plaintiff cannot prevail. *Id.* On the other hand, if there are disputed issues of material fact as to whether a violation of the Constitution has been shown, summary judgment is inappropriate unless the right is not clearly established.[1]

### FACTS

---

[1] The Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), held that "[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. Defendants seek summary judgment based on qualified immunity. Determining whether an official is entitled to qualified immunity generally requires a two-step inquiry. *See generally Pearson v. Callahan*, 555 U.S. ____ , 129 S. Ct. 808 (2009). In *Saucier v. Katz*, 533 U.S. 194, 200 (2001), the Supreme Court held that the test for determining qualified immunity requires that the court make a two-step inquiry "in proper sequence." In *Pearson*, however, the Court found that it is not necessary that the court review these steps in a particular order, as the inquiry process is left to the court's discretion. *Pearson*, 555 U.S. at ___, 129 S. Ct. at 818. Thus, this court may first inquire whether the right allegedly violated was clearly established at the time of the alleged offense. *Id.* If the right was not clearly established at the time of the alleged offense, then the court's inquiry need go no further. *Pearson* "does not prevent the lower courts from following the *Saucier* procedure; it simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases." *Id.*, 555 U.S. at ____, 129 S. Ct. at 821.

Taken in the light most favorable to Plaintiff, the facts are as follows. On Saturday, February 18, 2006, Plaintiff was caring for her toddler granddaughter, who was staying with her overnight. At some point that evening, Plaintiff bathed the child and noticed redness and swelling in the child's vaginal area. Moreover, the child was uncooperative with Plaintiff's attempt to clean the area. Plaintiff testified in her deposition that the child's behavior raised "a red flag in [her] mind," Excerpts of Depo. of Sharon Cousar (hereinafter "Pla. Depo.") at 86 (Dkt. # 48-9, filed Feb. 13, 2009), and "it was not diaper rash." *Id*. at 87; *see also id*. at 215 ("I knew that it was no diaper rash."). Plaintiff was alarmed and suspected that the child may have been the victim of sexual abuse or assault. *Id*. at 87-88.

The next morning, Plaintiff decided to call authorities "at least [to] make sure that [she was] wrong." *Id*. at 88. At approximately 7:45 a.m. on Sunday, February 19, 2006, Plaintiff dialed 911, which she knew was an "emergency" number, "to ask what I should do." *Id*. at 89. The 911 operator dispatched a Richland County Sheriff's Deputy to Plaintiff's residence. Officer Benjamin Fields (Fields) arrived at Plaintiff's residence at approximately 8:00 a.m. Fields did not activate his emergency lights ("blue lights") as he drove to Plaintiff's residence. When Fields arrived, Plaintiff relayed her suspicions to him, including "I know diaper rash and that's not it." Excerpts of Depo. of Benjamin Fields (hereinafter "Fields Depo.") at 48 (Dkt. # 50-14, filed Mar. 3, 2009). Fields told Plaintiff that he was unsure of how he should proceed, and that he needed to contact his supervisor.[2]

Fields radioed his supervisor, Officer Joseph Clarke (Clarke), who responded to the scene. Clarke did not activate his blue lights while en route. When Clarke arrived, Plaintiff repeated her concerns to him. Clarke testified in his deposition that Plaintiff was "adamant" about her suspicions. Excerpts of Depo. of Joseph A. Clarke (hereinafter "Clarke Depo.") at 58 (Dkt. # 50-12, filed Mar.

---

[2]Fields was a relatively new patrol officer at the time of this incident.

3, 2009). Clarke told Plaintiff that he would contact an investigator, and that the child needed to be evaluated by a physician. Pla. Depo at 95. According to the Complaint, "Officer Clarke asked Cousar if she would be willing to take the child to a hospital for an examination, and Cousar agreed to do so after church. After a discussion with Officer Clarke, Cousar agreed to take the child to the hospital immediately." Compl. at ¶ 18 (Dkt. # 1, filed Feb. 5, 2008).

Clarke contacted Investigator Gilbert Gallegos (Gallegos)[3] via telephone. Gallegos agreed to respond to Plaintiff's residence. Clarke conveyed to Plaintiff and Fields that Gallegos was on his way, and then departed. Clarke believed when he left "that within ten or 15 minutes of someone getting dressed, this child would be transported to the hospital." Clarke Depo. at 54.[4] Clarke also testified that he left it to the discretion of the investigator how the child would get to the hospital. Clarke Depo. at 54.

Gallegos arrived at Plaintiff's residence at approximately 8:50 a.m. Plaintiff again repeated her concerns to Gallegos, who inquired why Plaintiff had waited to contact authorities if she (Plaintiff) had developed her suspicions the previous evening. Plaintiff indicated that she had been concerned that she was overreacting but that by the following morning, she still felt she should contact authorities. Pla. Depo. at 88. Gallegos told Plaintiff that "the child needed to be taken to the hospital to get evaluated for any type of evidence, you know, physically to the child or either

---

[3]Gallegos is not a defendant in this action.

[4]The officers vary in their testimony as to whether Plaintiff and the child were in pajamas or dressed for the day when law enforcement arrived. Fields, who was the first officer on the scene, testified that he did not remember what Plaintiff was wearing when he arrived, but when she was stopped in the driveway, he remembers her wearing "a dress [ ] with a big like overcoat thing over her and some gloves." Fields Depo. at 96. Clarke indicated that Plaintiff was not "ready to go" when he left the residence the first time. Clarke Depo. at 54. Gallegos testified that he did not specifically remember what Plaintiff was wearing when he arrived, but that "I remember it being clothes ready to go." Gallegos Depo. at 34.

clothing. That [there was] an immediate concern for the safety of the child . . . ." Excerpts of Depo. of Gilbert Charles Gallegos (hereinafter "Gallegos Depo.") at 31 (Dkt. # 50-13, filed Mar. 3, 2009).

Both Gallegos and Fields testified that the child did not appear to be in physical distress and appeared to be comfortable the entire time they were there. Gallegos Depo. at 38; Fields Depo. at 114. None of the law enforcement officers who responded that day had any training – medical or otherwise – to recognize physical symptoms of sexual trauma or abuse. *See* Fields Depo. at 51; Clarke Depo. at 63; Gallegos Depo. at 23.

The sequence of what occurred next is not entirely clear in the record. Gallegos testified that "initially, we thought [Plaintiff] might take her to the hospital . . . ." Gallegos Depo. at 34. Gallegos testified that if Plaintiff had, at that point, agreed to take the child to the hospital immediately, it would have been acceptable for her to transport the child herself. *See* Gallegos Depo. at 35.

As noted above, the Complaint states Plaintiff told Clarke that it was not a problem for her to take the child to the hospital immediately. Compl. at ¶ 18. However, Plaintiff also testified at her deposition that her intention was to take the child to the hospital after she attended church. S*ee* Pla. Depo. at 102 ("I said, 'I'll take her at noon.' . . . [Q:] So your intention was to take the baby to church? [A:] That's right."). *See also* Gallegos Depo. at 42 (Plaintiff "maintained she was going to take the child to church first.").

Notwithstanding Plaintiff's purported willingness to forego attending church and immediately take the child to be evaluated, ten minutes after Gallegos's arrival, a call was placed to Richland County dispatch by either Fields or Gallegos requesting that EMS be sent to the scene.[5] *See* EMS Rpt. indicating "call received" at 9:01 a.m. (Dkt. # 46-15, filed Feb. 13, 2009). EMS

---

[5]Clarke was not present when this occurred and neither Fields nor Gallegos specifically remembers contacting dispatch.

personnel arrived at 9:13 a.m. *Id.* Plaintiff believed the officers called for EMS because the officers wanted the child to be evaluated "sooner than noon." Pla. Depo. at 102 ("[Q: reading Plaintiff's statement] 'But they later called an ambulance because, I assume, they wanted the baby to go to the hospital sooner.' [A]: Exactly.").

Gallegos testified that EMS personnel gave Plaintiff the "option" of taking the child to the hospital herself. Gallegos Depo. at 40. *See also* Pla. Depo. at 105 ("He responded, 'Well, Ms. Cousar, what hospital are you going to take her to?' letting me know it was okay.").[6]

EMS requested that they be allowed to assess the child by, *inter alia*, taking her blood pressure and Plaintiff "said no." Pla. Depo at 119. This refusal was based upon Plaintiff's belief that "[EMS] should take vital signs of people who are in some sort of trauma or emergency." *Id.* at 120. There is no evidence in the record that she conveyed this belief to either EMS personnel or the law enforcement officers. Plaintiff agreed that she did not know what protocol EMS personnel were required to follow once they had been dispatched to a scene. Pla. Depo. at 94.

Shortly after refusing to allow EMS to evaluate the child, Plaintiff asked EMS and law enforcement personnel to leave her residence. Gallegos testified that although she was upset, "[s]he wasn't loud at that time." *Id.* at 42.[7]

Once outside the residence, Fields contacted Clarke. Clarke testified that Fields told him

> Primarily that he and EMS and Gallegos had been kicked out of the house, and I asked for clarification on that, and it was probably incredulous on my part, like, "What do you mean you were kicked out of the house? What's going on?" I remember saying something to the fact of, "Why are y'all still there," meaning this

---

[6]As only excerpts of depositions have been filed with the court, the record is unclear as to whom "he" refers.

[7]Fields testified that "[s]he wanted us to get out because we were done. She didn't need our help anymore. We were overreacting. Get out of the house . . . [was] what she said to all of us." Fields Depo. at 89-90.

had been a while.

\* \* \*

I said, "Who's there now?" And he said, you know, to that effect, and that's when I learned that EMS and Fields, I mean, Gallegos was there, and they had been kicked out of the house. She was refusing to talk to them, slammed the door in their face and told them to get out.

\* \* \*

He had made it clear to me that they had -- she had ordered them out of the house. She was in the house with the child alone. That alarmed me. I thought something, something's wrong here. You know, what has happened?

Clarke Depo. at 68, 74, 75.

After EMS and law enforcement personnel departed the residence but prior to Clarke's return to the scene, Plaintiff put the child in her car (which was in a garage), locked the door to her house, and "headed for the hospital." Pla. Depo. at 122. Gallegos stopped Plaintiff as she attempted to depart. *Id*. Plaintiff testified that she did not know "why he was stopping me." *Id*. Gallegos testified that he asked Plaintiff where she was going and she indicated that she was going to "[c]hurch." Gallegos Depo. at 43. Plaintiff has not provided any evidence contrary to this testimony.

During his deposition, Gallegos was asked:

At this point – So I'm trying to decide when the precise moment the EPC [Emergency Protective Custody] decision was made. When was that made in relation to what you're discussing with her outside of her car?

[A:] Once on her on [sic] decision to attempt to leave the driveway, and after those things have happened inside with her not letting EMS at least check her vitals, saying that she's going to take her to church first, then the hospital, as soon as she was about to leave and we had her exit the vehicle, that's when the child was going to be EPC'd.[8]

[Q:] Okay. Did you believe Ms. Cousar was an imminent threat to her granddaughter at that point?

_____

[8]Gallegos testified that he made the decision to place the child in EPC in consultation with Sergeant Strange, an off-scene investigator who was his supervisor. Gallegos Depo. at 43.

[A:]  At that point I did . . . .   Because the evidence she presented inside without, you know, the child getting checked, that she was going to go to church first, then the hospital.  We were there for the imminent safety of that child.

Gallegos Depo. at 50.  Clarke testified that after Fields called him, he contacted "Sergeant Strange" (who apparently was in a supervisory position over Gallegos), "and when I explained to him, just by what I knew, as I was then rather quickly heading to the scene to find out what was going on, he told me this child will be EPC'd."  Clarke Depo. at 75.

While Clarke was still en route, Gallegos directed that Plaintiff get out of the car.  Plaintiff got out and Fields attempted to prevent her reentry into the vehicle by blocking the driver's side door of her car.  *Id*. at 125.  Plaintiff testified that Gallegos said, "' [t]his is an emergency situation and the child needs to go by ambulance.'"  *Id*.  Plaintiff "respectfully disagreed."  *Id*.

Clarke returned just after Gallegos stopped Plaintiff in the driveway.  Gallegos returned to his vehicle to attempt to contact the child's parents and did not witness the arrest.[9]  Clarke told Plaintiff that she "needed to let the child go by ambulance."  Pla. Depo at 137.  Clarke also testified that "[s]he told me [at the time], 'I'm taking this child to church, and I'll take her to the hospital when I get around to it.'"  Clarke Depo. at 80.  Plaintiff has not provided any evidence contrary to this testimony.

As Fields blocked the driver's side door of the vehicle, Plaintiff apparently reached into the vehicle and retrieved her cellular telephone.  Plaintiff not only called 911 again, but also attempted to call the child's father.  Additionally, she then reached into her car to retrieve her gloves.  Pla. Depo. at 138 ("I **again** reached into the car to get my gloves.") (emphasis added).  While she was putting her gloves on, "'I shifted my body from facing the supervising officer . . . [a]nd the next .

_____

[9]Gallegos testified that he made contact with the child's parents and they wanted her to get to a hospital as soon as possible to be checked by a doctor.  Gallegos Depo. at 44.

. . thing I knew both of them grabbed my arms.'" *Id*. at 138-39. Plaintiff testified that the officers were "trying to wrestle me to the ground in order to handcuff me," and that she was resisting such efforts. *Id*. at 139.

Plaintiff was arrested and charged with resisting arrest. She was later indicted on this charge as well as the common law charge of obstruction of justice. Both charges were dismissed by the Solicitor on August 22, 2007. Plaintiff brought suit in this court on February 8, 2008, alleging violations of her constitutional rights (both federal and state), as well as certain state tort claims.

## OFFICIAL CAPACITY CLAIMS

The Eleventh Amendment bars suits in federal courts for money damages against an "unconsenting State." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). This immunity extends to "arm[s] of the State," *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1974), including state agencies and state officers acting in their official capacity. *Gray v. Laws*, 51 F.3d 426, 430 (4th Cir. 1995). The individually-named Defendants are deputy sheriffs. Sheriffs in South Carolina are an "arm of the state." *See Gulledge v. Smart*, 691 F.Supp. 947 (D.S.C. 1988) (holding that South Carolina sheriffs are state officials for Eleventh Amendment purposes), *aff'd mem.*, 878 F.2d 379 (4th Cir. 1989). Therefore, to the extent sued in this "official capacity," Defendants, as employees of the Sheriff, are immune from suit as they are treated as "arms of the State." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989). However, Plaintiff seeks damages from the individuals in their individual capacities. To the extent sued in their individual capacities, the individual Defendants are not immune from suit.

## NON-FOURTH AMENDMENT FEDERAL CONSTITUTIONAL CLAIMS

Plaintiff's complaint "is far from a model of clarity, rendering enigmatic an identification of 'the specific constitutional right allegedly infringed by the challenged [conduct].'" *Taylor v.*

*Waters*, 81 F.3d 429, 433 (4th Cir. 1996) (quoting *Graham v. Conner*, 490 U.S. 386, 394 (1989)). The complaint contains claims related to alleged violations of her Fifth, Sixth, Eighth and Fourteenth Amendment rights. *See* Compl. at ¶ 1 (Plaintiff seeks to vindicate" the rights to be free from illegal search and seizure, liberty, free from arrest without a warrant, due process, and equal protection."). However, the only viable claims in this matter relate to Plaintiff's Fourth Amendment rights. Indeed, she abandons her other federal constitutional claims in failing to submit argument or evidence in opposition to Defendants' summary judgment motion on these grounds. Therefore, to the extent they are asserted, the court **grants** Defendants' motion for summary judgment on all federal claims other than claims arising under the Fourth Amendment.

### RICHLAND COUNTY SHERIFF'S DEPARTMENT

The complaint contains allegations against the Richland County Sheriff's Department (RCSD). However, Plaintiff has abandoned any claim against the RCSD as she has not included any argument in opposition to Defendant RCSD's motion for summary judgment. Therefore, for the reasons stated by Defendant RCSD, with which the court agrees, Defendant RCSD is dismissed from this action.

### FOURTH AMENDMENT – UNREASONABLE SEIZURE

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." As relates to seizures, the Supreme Court has recognized three distinct types of encounters between law enforcement officials and citizens. The first is what is deemed a consensual encounter between a citizen and an officer, which is not a Fourth Amendment event. *See Florida v. Bostick*, 501 U.S. 429 (1991). The second is a brief investigatory stop, supported by a reasonable, articulable suspicion of criminal activity. *See Terry v. Ohio*, 392 U.S. 1 (1968). The third is an

11

arrest, supported by probable cause. *Brown v. Illinois*, 422 U.S. 590 (1975).

There is no question that at the time of this incident, the right to be free from arrest absent probable cause was clearly established. Therefore, this court must determine whether the facts, taken in the light most favorable to Plaintiff, indicate that a "police officer acting under the circumstances at issue reasonably could have believed that he had probable cause to arrest" Plaintiff. *Sevigny v. Dicksey*, 846 F.2d 953, 956 (4th Cir. 1988).

An event which triggers the protections of the Fourth Amendment occurs "when there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989). This certainly applies to Gallegos' action of halting Plaintiff as she drove out of the garage. However, Gallegos did not arrest Plaintiff. Rather, Gallegos stopped Plaintiff because he had decided to place the child in EPC. Therefore, whether Gallegos had probable cause to initiate EPC as to the child operates to inform the separate question of whether a reasonable officer would believe that he had probable cause to arrest Plaintiff.

"Probable cause, for Fourth Amendment purposes, means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992) (internal quotations and citations omitted). The existence of probable cause depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Two factors inform the determination of whether probable cause existed in any given situation: "the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." *Id.* However, "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment . . . ." *Hill v. California*,

401 U.S. 797, 804 (1971). Therefore, probable cause "could be lacking in a given case, and an arrestee's right violated, either because of an arresting officer's insufficient factual knowledge, or legal misunderstanding, or both." *Id.*

"[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). The Supreme Court has explained that "the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent." *Whren v. United States*, 517 U.S. 806, 814 (1996). An arrest is valid if "based on the facts known to the officer, objective probable cause exist[s] as to *any* crime." *United States v. McNeill*, 484 F.3d 301, 311 (4th Cir. 2007) (citing *Devenpeck*, *supra*). *See also Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) ("[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . .it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest.").

The facts known to the arresting officers, in the light most favorable to Plaintiff, were: (1) Plaintiff had called 911 to report that she believed that her granddaughter may have been the victim of sexual assault or abuse; (2) Plaintiff had represented to both Clarke and Fields that she knew what diaper rash looked like, and what she had seen was not diaper rash; (3) at least at some point, Plaintiff had expressed her desire to take the child to be examined *after* she took the child to church; (4) Plaintiff had refused to allow EMS personnel to check the child's vital signs; (5) Plaintiff had asked law enforcement and EMS personnel to leave her residence; (6) Clarke was surprised when Fields contacted him again because they had been on the scene for so long and Clarke became "alarmed" when Fields relayed to him that law enforcement and EMS personnel had been "ordered" to leave the house; (7) Clarke and Fields did not make the decision to initiate EPC and the decision

to initiate EPC had occurred prior to Clarke's return to the scene; (9) both Gallegos and Clarke told Plaintiff that "this is an emergency situation," and she needed to let the child go by ambulance; (10) Plaintiff had disagreed with their directives; and (11) when Clarke arrived, Plaintiff was outside her vehicle, which was in the driveway, with the child inside the vehicle.

Plaintiff admitted that both Gallegos and Clarke told her that "this is an emergency situation and the child needs to go by ambulance."  Whether or not probable cause existed to take the child into protective custody does not change the fact that the decision to initiate EPC had been made and that she was instructed by two separate officers that she needed to let the child be placed in the ambulance.

In South Carolina, common-law obstruction of justice "is . . .any act which prevents, obstructs, impedes, or hinders the administration of justice." *State v. Lyles-Gray*, 492 S.E.2d 802, 805 (S.C. App. 1997).  The indictment returned in September 2006 charges that Plaintiff

> impeded the administration of justice by attempting to knowingly remove or conceal evidence, to wit:  After calling 911 to report that her granddaughter showed signs of being sexually molested; when deputies arrived Sharon Cousar interfered with and attempted to prevent the medical examination of that baby by attempting to leave the scene, taking the baby with her.  This was during an active criminal investigation.

Attachment to Defs. Mem. in Supp. of Summ. J. (Dkt. # 48-2, filed Feb. 13, 2009).  Plaintiff had refused both Gallegos' and Clarke's directives to allow the child to go to the hospital by ambulance after Gallegos had made the decision to initiate EPC for the child.  Therefore, the court finds that objective probable cause existed for Plaintiff's arrest for common law obstruction of justice.[10]

---

[10]Clarke testified that when he re-engaged Plaintiff upon his return "I had made it very clear that her interactions in any way from this point forward would result in her subsequent arrest or detention."  Clarke Depo. at 95.  Clarke also testified that when he thereafter placed handcuffs on her "she was being placed in investigative detention, pending arrest."  *Id*.  It appears from his testimony that Clarke believed Plaintiff had not actually been placed under arrest when he handcuffed her.  Assuming she was not "arrested" at this point, there would not have been probable cause to charge her with resisting arrest.  *See* S.C. Code § 16-9-320(A) (year); *State v. Brannon*, 666

Accordingly, the court finds that, viewing the evidence in the light most favorable to Plaintiff, the facts fail to show that the officers' conduct violated a constitutional right. Therefore, Defendants are entitled to summary judgment relating to Plaintiff's claim that they violated her Fourth Amendment right to be free from arrest without probable cause.

### EXCESSIVE FORCE

"*[A]ll* claims that law enforcement officials have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v. Conner*, 490 U.S. 386, 395 (1989).[11]  *See also Riley v. Dorton*, 115 F.3d 1159, 1161 (4th Cir.1997) (en banc) (the Fourth Amendment "governs claims of excessive force during the course of an arrest, investigatory stop, or other 'seizure' of a person."). The Fourth Amendment test is "an objective one:  the

---

S.E.2d 272, 283 (S.C. 2008) ("Section 16-9-320(A) requires that there be an 'arrest being made' in order to support a conviction.").

However, Clarke's subjective belief does not dictate whether the objective facts evidence an arrest. To determine whether an encounter has escalated into an arrest, a court examines the totality of the circumstances of the encounter to ascertain whether a reasonable person would feel free to leave or otherwise terminate the encounter. *United States v. Sullivan*, 138 F.3d 126, 133 (4th Cir. 1998). If a reasonable person would not have felt free to leave, the seizure is likely an arrest. Courts examine many factors in making this determination, including "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the officer's statements to others present during the encounter, the threatening presence of several officers, the potential display of a weapon by an officer, and the physical touching by the police of the citizen." *United States v. Weaver*,  282 F.3d 302, 310 (4th Cir. 2002).   Not only had Clarke been summoned back to the scene where there were two other officers, but he then told Plaintiff that further delay on her part would likely result in her arrest. Thereafter, Plaintiff admits that she "resisted" the officers' attempts to place handcuffs on her. Therefore, the court finds that the totality of the circumstances indicate that the encounter had escalated into an arrest.

[11]The Fourth Circuit has rejected any concept of a continuing seizure rule, noting that "the Fourth Amendment . . . applies to the initial decision to detain an accused, not to the conditions of confinement after that decision has been made." *Riley v. Dorton*, 115 F.3d 1159, 1163 (4th Cir. 1997) (en banc) (internal citations and punctuation omitted). Once the single act of detaining an individual has been accomplished, the Fourth Amendment ceases to apply. *Id*. *See also Robles v. Prince George's County, Maryland*, 302 F.3d 262, 268 (4th Cir. 2002).

question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. The test of reasonableness is "not capable of precise definition or mechanical application." *Id*. at 396.[12] In determining the reasonableness of the use of force, the court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the importance of the governmental interest alleged to justify the intrusion. *Id*. (citations omitted). Courts have "long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id*. (citations omitted). This right is obviously greater when the suspect is resisting arrest and refusing to comply with the officer's orders. It was, therefore, clearly established at the time of this incident that Plaintiff had the right to be free from the application of unreasonable force by Defendants during the course of her arrest. *See Valladares v. Cordero*, 552 F.3d 384, 388 (4th Cir. 2009).

      Fields testified that Plaintiff was "[p]ushing and pulling and trying to get away from us," and that he "tried to grab her by the hand, the straight arm bar takedown to the ground once she started pushing and pulling away." Fields Depo. at 116. Plaintiff testified that "both of them grabbed my arms[,]" Pla. Depo. at 139. Plaintiff admitted that she was resisting the officers' attempts to handcuff her and that "I resisted because they were trying to get me on the ground. It was cold and I did not want to be on the ground." Pla. Depo. at 139. Based on the foregoing, the court finds that the officers' actions were objectively reasonable in light of the circumstances

---

[12]Defendants argue Plaintiff fails to establish that her injuries were more than *de minimus*, and that Plaintiff accordingly fails to establish injury sufficient to satisfy a constitutional threshold. However, the requirement of more than *de minimus* injury relates to the separate analysis applied to pretrial detainees under the Due Process Clause of the Fourteenth Amendment. As noted above, Plaintiff claims that Clarke and Fields used excessive force *during* the course of her arrest. Therefore, because the analysis proceeds under the Fourth Amendment, the only determination for the court to make is whether the officers' actions were reasonable.

confronting them, as Plaintiff readily admits that she was openly resisting their efforts to place handcuffs on her.

For these reasons, the court finds that the amount of force used by Defendants was reasonable, and Defendants are entitled to summary judgment as Plaintiff has failed to establish a violation of her Fourth Amendment rights.

### STATE LAW CLAIMS

It is this court's customary practice to decline to exercise supplemental jurisdiction over state law claims when the federal claims are dismissed in advance of trial. 28 U.S.C. § 1367; *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966). As the Fourth Circuit explained in *Taylor v. Waters*, 81 F.3d 429, 437 (4th Cir. 1996), the decision to decline the exercise of supplemental jurisdiction after dismissal of the original jurisdiction claim will "hinge on the moment within the litigation when the dismissal of the touchstone claim takes place . . . ." (*quoting* 28 U.S.C. § 1367, practice commentary (West 1993)). Where the original jurisdiction claim is dismissed before trial, the state claims should be dismissed as well. *Gibbs*, 383 U.S. at 717; *Taylor*, 81 F.3d at 437. The court notes that 28 U.S.C. § 1367(d) provides that "[t]he period of limitations for any [state law claim asserted under 1367(a)] . . . shall be tolled while the claim is pending [in federal court] and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." The constitutionality of this statute was upheld in *Jinks v. Richland County*, 538 U.S. 456 (2003).

Therefore, the court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law causes of action and dismisses these without prejudice.

### CONCLUSION

Defendants' motion for summary judgment is **granted** as to all of Plaintiff's federal claims and these are dismissed with prejudice. Plaintiff's remaining claims for relief under state law are

**dismissed from this action without prejudice**.

      **IT IS SO ORDERED.**

                             s/ Cameron McGowan Currie
                             CAMERON MCGOWAN CURRIE
                             UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
April 10, 2009